IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 14, 2018 Session

## STATE OF TENNESSEE v. DARRELL PARTIN AND CHANDA PARTIN

**Appeal from the Criminal Court for Putnam County**
**No. 2015-CR-533   Gary McKenzie, Judge**

_____

### No. M2017-02381-CCA-R3-CD

_____

The Defendants, Darrell Partin and Chanda Partin, were indicted for theft in connection with Mr. Partin's employment at Tennessee Master Restoration ("TMR"), and the case proceeded to a bench trial. During trial, the Defendants discovered that the State had failed to produce documents in the possession of TMR which supported the Defendants' theory of the case. After a continuance, the trial court concluded that the failure to produce the documents was a violation of Tennessee Rule of Criminal Procedure 16 and of the duty to disclose exculpatory material under *Brady v. Maryland*, 373 U.S. 83 (1963). The trial court then granted a mistrial and dismissed the charges with prejudice based on the Rule 16 violation. The State appeals. After a thorough review of the record, we conclude that the trial court abused its discretion in dismissing the charges, and we remand for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Reversed;**
**Case Remanded**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN, J., joined. NORMA MCGEE OGLE, J., concurred in results only.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Bret Gunn, Assistant District Attorney General, for the appellant, State of Tennessee.

John B. Nisbet III, Livingston, Tennessee, for the appellee, Darrell Partin.

Gordon A. Byars, Cookeville, Tennessee, for the appellee, Chanda Partin.

## OPINION

# FACTUAL AND PROCEDURAL HISTORY

The charges at issue came about as the result of an employment relationship "gone sour." TMR was operating as a limited liability company with four members, one of whom managed the operations. When the managing partner left, Mr. Darrell Partin was hired to replace him, although the parties dispute whether Mr. Partin had an ownership interest in the company. Business increased under Mr. Partin's management, but approximately one year later, Mr. Partin left the company to start a rival business, taking most of TMR's employees with him. According to TMR, Mr. Partin left because of TMR's refusal to hire his wife, Ms. Chanda Partin. According to the Defendants, Mr. Partin left after discovering that TMR had included false statements on its application for workers' compensation insurance. During Mr. Partin's employment, he and Ms. Partin made personal purchases using company accounts. After Mr. Partin left the company, he was still in possession of cash payments made for work performed by TMR, and he turned these payments over to his civil attorney. Mr. Partin was charged with theft of property valued at over $10,000, and Ms. Partin was charged with theft of property valued at over $2,500. The Defendants asserted that Mr. Partin was an owner of TMR, that employees were routinely given advances or permitted to make personal purchases with company accounts, and that their purchases were accordingly authorized by TMR. They also argued that the cash payments made for TMR work constituted disputed funds because TMR stopped payment on Mr. Partin's final two paychecks and because he was entitled to partnership distributions.

During discovery, the Defendants sought TMR's business records related to employee compensation. In a motion for supplemental discovery, the defense asked for various business records, including a list of "all compensations made to employees" from TMR for a period of three years, including "pay, salary, reimbursements for business expenses, bonuses, and gifts." The motion asserted that the Defendants intended to demonstrate that they had the authority to make purchases on the company credit cards and charge accounts. The defense simultaneously moved for the trial court to grant a subpoena to TMR for the records on the same grounds. The State filed a response opposing the subpoena to TMR on various grounds, including that some of the records requested were not relevant, that some records had disappeared at the time Mr. Partin left the company, and that reconstructing or obtaining the records would be prohibitively expensive. The response included an estimate of $1,200 for the requested employee compensation information.

On July 27, 2016, the trial court held a hearing on the discovery dispute. The Defendants objected to the State's motion to quash the subpoena, asserting that the State had no standing to file the motion. The Defendants argued that Mr. Partin was a partner in the company, that Ms. Partin was an employee of the company, and that the records

would support the defense's theory about the Defendants' relationship to the company and would demonstrate the company's past patterns of practice.

Mr. Steven Copeland testified at the hearing that he was a member of TMR, a company which focused on restoring homes damaged by fire or water and which also performed roofing. Prior to the time Mr. Partin was hired in August of 2013, TMR had four partners: Mr. Copeland, Mr. Copeland's father, Mr. Copeland's uncle, and Mr. Tony Mott. The four were also partners in a separate company which owned the real property used by TMR. Mr. Mott managed the day-to-day operations of TMR, and the other partners had little involvement other than attendance at monthly meetings. Mr. Mott made a salary of close to $50,000 and took distributions from the partnership. Mr. Copeland testified that in July 2013, Mr. Mott became "burned out" and was given $60,000 for his ownership interest in TMR and an additional $40,000 for his ownership interest in the company which owned the real property associated with TMR.

According to Mr. Copeland, TMR at first offered Mr. Partin work on the same terms as those under which Mr. Mott was employed: $50,000 in salary with the opportunity to obtain a one-quarter interest in the company after one year. Mr. Copeland testified that Mr. Partin, however, negotiated for a higher salary of $75,000 and no partnership interest, and he began to work for TMR in August 2013. He testified that the agreements between TMR and Mr. Mott were in writing but that there was no writing granting Mr. Partin a partnership interest. Mr. Partin attended the monthly meetings of the members of the company. TMR was satisfied with the quality of Mr. Partin's work at the beginning of the employment relationship.

According to Mr. Copeland, in early 2014, Mr. Partin began to try to convince the members of TMR to hire Ms. Partin. Mr. Copeland testified that Ms. Partin worked for him from January 2013 to October 2013 at an insurance company that he owned but that he was dissatisfied with the quality of Ms. Partin's work. He testified that TMR repeatedly refused to hire Ms. Partin and that she was never an employee of TMR. He denied asking TMR's credit card company to issue a card for Ms. Partin and stated he was not aware at the time that she was negotiating advertisements on behalf of the company. He acknowledged that he was aware that Ms. Partin was helping Mr. Partin at work, but he denied that she was employed by TMR.

Mr. Copeland testified that at the beginning of August 2014, Mr. Partin and all of his employees resigned. Mr. Partin told Mr. Copeland that the files, keys, cell phones, and information about the company's current jobs were all on the premises. Mr. Copeland's uncle spoke with one of the employees who had resigned, and this employee returned to work for TMR immediately. Mr. Copeland was not intimately familiar with the business, but when he went to the building, he felt that some equipment was missing.

He asked the police department to watch the TMR premises, and they observed Mr. Partin at the building shortly after midnight, returning equipment. Mr. Copeland testified that he also recovered equipment that had been left at job sites.

Mr. Copeland testified that Ms. Partin's name had been added to the Lowe's credit card account and that she had purchased children's play equipment, a table, and a refrigerator for personal use. These items were found at the Defendants' residence by the Tennessee Bureau of Investigation ("TBI"). Mr. Copeland denied that employees were permitted to make personal purchases on the Lowe's credit account in order to take advantage of the company's discount. He agreed that he stopped payment on "the last couple" of Mr. Partin's paychecks but could not recall his reasoning.

Upon Mr. Partin's resignation, Mr. Copeland discovered that his business records, including credit card statements, bank statements, and bills, were missing. He hired an accountant to attempt to reconstruct some of the business records from the time of Mr. Partin's employment, and the records produced by the accountant had been provided in discovery.

Mr. Copeland testified that the payroll information was "probably" on a computer system but would need to be recreated. While he acknowledged that the payroll records were not among the missing business records because his wife "did those at the house," he testified that they would have to be located "and I don't want her doing that, so we'd have to hire a bookkeeper and accountant, somebody to go back and get those." He agreed that the payroll documents would not be "terribly difficult" to find. Mr. Copeland stated he was not aware of any occasions on which employees were "fronted" money that was later offset in their compensation.

Mr. Copeland answered various questions regarding TMR's compliance with the statutory requirements of LLCs. He was not aware that the addition or removal of a partner required a supplemental report or that a partner's leaving would be an event resulting in dissolution. Mr. Copeland agreed that TMR was a construction, water restoration, and roofing company and not a laundry service or an office. He acknowledged that he was licensed to write insurance policies and that an insurance premium would depend on the type of business insured, but he denied intentionally falsifying his application for workers' compensation insurance by mischaracterizing the nature of TMR's business.

At the end of the hearing, the trial court ordered the State to produce the LLC documents that were in the possession of the Secretary of State. The trial court noted that the State had "the ability to work with the victim" to produce certain documents, including partnership agreements that were presumably within the possession of TMR.

The trial court also noted that information regarding prior partnership distributions was essentially in the possession of the State and that the State would need to produce the requested information. In general, the prosecutor agreed that while Mr. Copeland did not apparently know where the business records were kept, the State would attempt to produce the documents in the possession of TMR or determine that they did not exist. The trial court noted that the parties could also discuss the feasibility of Mr. Copeland printing his statements from Lowe's and producing them, and that if the parties could not come to an agreement, the defense could issue a subpoena to Lowe's.

Regarding the employee compensation records, the trial court asked the prosecutor if there was any objection to producing "records that exist on a computer that is local … and we're talking about just printing off those records." The prosecutor replied that he had no objection and would "direct [Mr. Copeland] to do that." The trial court summarized that the prosecution would produce the payroll documents in existence on the computer. The trial court, however, also determined that only payroll documents created during the time period of Mr. Partin's employment would be relevant. At the end of the hearing, the prosecutor summarized his understanding that the defense would send a letter listing the documents it was requesting and that he would then "take that to Mr. Copeland, and we'll work on getting those things if we can, and explaining why we can't if we can't."

The record reflects that the defense did indeed provide a letter detailing the items requested. Regarding the compensation documents, the letter noted that testimony revealed that Ms. Vicki Copeland kept the documents at her home and that they were "likely available electronically at little or no costs." At a status conference on October 28, 2016, the parties told the court that the prosecution had obtained additional discovery and given it to the defense that morning, and the hearing was rescheduled to give the defense a chance to "see if … what they wanted is there."

After other pretrial proceedings, the Defendants waived their right to a jury trial, and the bench trial commenced. The first witnesses testified on May 16, 2017, after which the trial was continued until July 20 and 21, when several other witnesses testified. We summarize the proof at trial primarily as it relates to the issues on appeal.

At trial, the State introduced proof regarding the property allegedly stolen by the Defendants. There was inconsistent evidence regarding whether Mr. Matthew McClearen delivered certain cash payments made for work performed by TMR to Mr. Partin before or after Mr. Partin had left TMR. The cash payments, which amounted to over $10,000, were recovered from Mr. Partin's civil attorney, who told TBI Special Agent Darrin Shockey that he had been holding the money as disputed funds since August 2014, when Mr. Partin left TMR. Agent Shockey agreed that the Defendants

stated that TMR had stopped payment on Mr. Partin's final two paychecks. There was also testimony regarding the circumstances of Mr. Partin returning equipment which belonged to TMR shortly after leaving to start his own business. Agent Shockey introduced a spreadsheet of allegedly improper purchases made by the Defendants. The purchases included numerous items related to construction as well as household and other items. There was testimony from various witnesses about whether certain categories of items from the spreadsheet may have been legitimate business expenses for TMR's office space, for TMR's mascot dog, or as corporate gifts. Agent Shockey testified that he executed a search warrant at the Defendants' home and discovered a children's playset, a refrigerator, and an air conditioner, collectively worth over $2,500, all of which had been purchased using TMR's account at Lowe's.

The State's witnesses also testified regarding the destruction of some of the TMR business records following Mr. Partin's departure. An employee of an information technology company testified that he had attempted to recover files from TMR's computers and had recovered certain business records but was unable to recover others. While the implication was that Mr. Partin destroyed the files, Mr. Matthew McClearen, who was an employee of TMR and who left the company to work at Romans Restoration, Mr. Partin's rival business, ultimately testified that he had instructed another employee to delete files from his computer because he did not want anyone to discover that he had used it to view pornography.

The defense introduced evidence regarding various business irregularities which it claimed led to the termination of the business relationship between the parties. There was evidence that TMR had submitted applications for workers' compensation which may have characterized the business as a cleaner and office and characterized a contractor who worked as a roofer as performing cleaning. The defense also attempted to establish that Mr. Partin had an ownership interest in the company, that Mr. Mott believed Mr. Mott's ownership interest was orally conferred by the Copelands, and that the company's business filings, which exhibited some irregularities, should not be relied on to demonstrate that Mr. Partin did not have an ownership interest.

The proof at trial also concerned whether TMR employees were permitted to make purchases with company funds and to subsequently reimburse the company. Mr. McClearen testified that Mr. Partin had permitted him to use company funds to purchase a car for approximately $1,300 with the understanding that he would reimburse the company. He acknowledged that he possessed tools bought with TMR funds but explained that these tools were purchased to replace equipment which he had owned and which was damaged while he was performing work for TMR. He acknowledged using TMR equipment to clean a house in which he was living and stated that other employees would borrow equipment for personal use. He stated that he did not take payments for

work completed on the property of the owners of the company. He also agreed that he did not return some equipment belonging to TMR to the company until after he had quit.

Mr. Mott testified that he had managed the company prior to Mr. Partin and that employees were not permitted to make personal purchases on TMR's Lowe's account. He testified this included minor purchases, such as drinks. He stated he was not aware that one employee bought a water heater with company funds, intending to reimburse the company later. Mr. Mott acknowledged that TMR occasionally performed work at the other partners' businesses without compensation. He observed that "[i]f we were slow, we always kept our employees busy," and he testified that he had TMR employees perform work at his own home. Mr. Mott acknowledged that at the time of his departure, he was given the option of purchasing the whole business or leaving, and while he denied having a substance abuse problem, he acknowledged using drugs while he worked at TMR and admitted he was convicted of manufacturing, selling, or delivering a Schedule VI controlled substance in a school zone.

Mr. Kevin Carico testified that he had been an employee at TMR for twenty years and began managing the fire and water restoration division in 2014 after Mr. Partin's departure. Mr. Carico acknowledged having used the Lowe's account for personal purchases, including a water heater. He stated he had asked Mr. Partin for permission to do so and that he had repaid the company. He did not believe employees made personal purchases on a regular basis. He also acknowledged keeping an air mover belonging to TMR at his home at one time.

Ms. Copeland's testimony led to the discovery of the documents which ultimately formed the basis for the trial court's dismissal. Ms. Copeland testified that she was married to Mr. Copeland at the time of Mr. Partin's employment and that she performed various accounting functions, including managing the payroll, end of the month reconciliations, and payables when necessary.

Ms. Copeland testified that she was also a bookkeeper for several other companies owned by the Copelands and that those companies would pay for work performed by TMR. According to Ms. Copeland, employees should not have purchased personal items on the company credit cards without approval. She stated that a manager would "probably" have the authority to approve such purchases. Mr. Partin never contacted her about reimbursing the company for personal purchases. She testified that Ms. Partin received two paychecks from TMR for assistance with a home show.

Ms. Copeland stated during her testimony that she kept payroll records on her home computer, that she had the ability to retrieve records back to 2013, and that she did not recall ever being asked to produce those records. Ms. Copeland testified, "And I'm

sure I have it. I just would have to find it. It would take me an hour." She elaborated, "As soon as I find it, I could print it off for you in ten minutes."

After Ms. Copeland's testimony, the defense moved to dismiss the case due to the failure to produce the documents. The prosecutor stated that he had asked Mr. Copeland to produce the requested documents. When Mr. Copeland gave him a voluminous amount of material, he gave it to the defense, noting that he had not looked through it and that they should alert him if something were missing. The defense never responded, and the prosecutor was not aware that the documents existed and had not been produced. Because the trial was not in front of a jury, the trial court continued the trial, ordering the documents to be provided to the defense and noting that the defense could renew its motion to dismiss after inspecting the documents.

On October 12, 2017, the Defendants again moved to dismiss the case, arguing that dismissal was the appropriate sanction for the discovery violations. In the motion, the Defendants asserted that when the general ledgers kept by Ms. Copeland were produced on July 25, 2017, the Defendants discovered exculpatory material, including a category of expenses labeled "employee advances" totaling $1,300 in 2014. The defense argued that they were prejudiced by the late discovery because they were unable to cross-examine witnesses based on the new evidence, noting in particular that the ledgers would serve to impeach Mr. Mott, Mr. Carico, Ms. Copeland, and Mr. Gary Leftwich, a certified public accountant who had testified regarding TMR's tax filings. The defense noted that it would "lose[] the valuable element of surprise with regard to impeachment testimony." The Defendants also argued that a continuance would allow the biased witnesses to "conjure explanations" for the impeachment evidence.

The trial court held a hearing on the motion on October 18, 2017. A compact disk with the ledgers was made an exhibit and numbered as a trial exhibit, but it is absent from the record on appeal. The defense articulated the prejudice it would suffer by stating that "they have had months of forethought on how to answer these questions" and noting that Mr. Copeland was present for the trial and that many of the witnesses were biased in his favor. The defense argued that both Mr. McClearen and Mr. Carico were shown as having received advances in the ledgers. The ledgers also showed that some employees unfamiliar to the defense had taken advances, and the Defendants could have discovered these witnesses if the ledgers had been produced. The defense also noted that it had forgone calling two witnesses but later discovered that they had taken advances according to the ledgers. While acknowledging that it "wouldn't lay very much of any fault at the [prosecutor's] feet," the defense noted that the ledgers were requested and not produced and that the Defendants did not make further requests because they believed that the requested documents were among the documents destroyed at Mr. McClearen's request. The defense argued that the State had enjoyed the benefit of hearing the theory of the

defense and that a mistrial would allow the State to strengthen its case. The State argued that there was no discovery violation because the materials were not in the State's custody or control and that the defense had not suffered any prejudice from the late production.

The trial court found that the documents were exculpatory. In particular, the trial court found that the material contradicted testimony that employees could not make personal purchases or receive cash advances. The ledgers also contained unidentified cash deposits which could have been repayments made by the Defendants for their personal purchases. While the trial court found that the State did not intentionally fail to produce the items or act in bad faith, it concluded that the failure to produce was the result of negligence and that the prosecutor was bound by his "affirmative statements to produce said documents." The trial court determined that the evidence was material under *Brady* and that the Defendants had "demonstrated that the absence of these ledgers deprived them of a fair trial." The trial court also found a Tennessee Rule of Criminal Procedure 16 discovery violation in the failure to produce the evidence. In shaping the remedy under Rule 16, the trial court found that a continuance would not remedy the prejudice suffered by the defense. The trial court also found that a mistrial by itself would strengthen the prosecution's case, cost the defense the element of surprise, and deprive the defense of the right to effectively cross-examine witnesses. The trial court granted a mistrial and then dismissed the charges with prejudice. The State appeals.

## ANALYSIS

The State argues that the trial court abused its discretion when it dismissed the case with prejudice. Regarding the trial court's analysis under *Brady v. Maryland*, the State argues that the evidence was not in the possession or control of the State and that it was produced in time to be used effectively at trial. The State also argues that the decision to dismiss was an abuse of discretion as a remedy for a discovery violation, given that the late production of the documents did not render the trial fundamentally unfair. The Defendants respond that the dismissal was based on the trial court's evaluation that a continuation of the proceedings would violate the principles of due process and fundamental fairness.

### I. Scope of Appellate Review

The State appeals from the trial court's order under Rule 3(c) of the Tennessee Rules of Appellate Procedure. As applicable to the current case, Rule 3 permits an appeal as of right by the State from:

an order or judgment entered by a trial court from which an appeal lies to the Supreme Court or Court of Criminal Appeals: (1) the substantive effect of which results in dismissing an indictment, information, or complaint; (2) setting aside a verdict of guilty and entering a judgment of acquittal; (3) arresting judgment; (4) granting or refusing to revoke probation; or (5) remanding a child to the juvenile court.

Tenn. R. App. P. 3(c). The trial court's dismissal of the case with prejudice satisfies Rule 3(c)(1) in that it had the substantive effect of dismissing the indictments.

The State argues that there was no violation of *Brady* because the documents were disclosed in time for the Defendants to use them during trial and because the documents were in the possession of a third party. It further contends that dismissal was an unreasonable remedy. Mr. Partin responds that the dismissal was not an abuse of discretion. Ms. Partin responds that the trial court did not dismiss based on the *Brady* violation but based on its inherent power to dismiss a case premised on fundamental fairness and on a denial of due process.

We agree that while the trial court specifically determined that the prosecution's failure to produce the documents was a violation of the duties imposed under *Brady*, the charges were not dismissed on that basis. Instead, the trial court also found a failure to comply with Tennessee Rule of Criminal Procedure 16, and it premised dismissal on the violation of Rule 16. Indeed, the judgment dismissing the charges engages in an orderly analysis of the various remedies available under Rule 16. The trial court found that the late production hampered the Defendants' ability to properly cross-examine witnesses, and it concluded that the appropriate remedy was dismissal.

In short, the trial court found that the prosecution violated Tennessee Rule of Criminal Procedure 16 by failing to disclose the documents, and it granted a mistrial and dismissed the case based on the remedies outlined in Rule 16(d)(2). Because review under Tennessee Rule of Appellate Procedure 3(c)(1) extends only to an order "the substantive effect of which results in dismissing an indictment, information, or complaint," we limit our review to the trial court's decision regarding the Rule 16 discovery violation, which had the substantive effect of dismissing the indictment. We do not address the trial court's *Brady* analysis or the trial court's granting of a mistrial.

## II. Discovery Violation

The State argues that it had no duty to produce the documents in discovery because the documents were in the possession of a third party and accordingly not within the State's "possession, custody, or control." Tenn. R. Crim. P. 16(a)(1)(F). The

Defendants respond that the State was responsible for the documents because it improperly interjected itself into the discovery process.

Prior to trial, the Defendants sought discovery, including the documents at issue, both from the State and through a motion for a subpoena. The State, not having the benefit of this court's opinion in *State v. Johnson*, 538 S.W.3d 32, 51-56 (Tenn. Crim. App. 2017),[1] opposed the subpoena, asserting that the production of the requested materials would be financially burdensome for TMR. Mr. Copeland testified that Ms. Copeland kept the payroll documents, that the documents were probably on a computer at her home, but that he did not want her to get the information herself "so we'd have to hire a bookkeeper or accountant, somebody to go back and get those." The estimated cost was $1,200. The court asked the prosecutor if there was a specific objection to producing these documents if they could be obtained by "just printing off those records," and the State responded that it had no objection if the materials were readily accessible. The trial court determined that the State should produce employee compensation records created during the period of Mr. Partin's employment. In particular, the trial court noted that the prosecutor should produce payroll records kept on a local computer, providing that they were in existence. The defense wrote the prosecutor a letter summarizing the trial court's rulings, specifically referencing the payroll documents "kept off site and handled by [Ms.] Copeland."

The parties agree that the prosecution produced approximately one thousand pages of discovery after the hearing and that this discovery did not include the payroll documents. The prosecutor stated that he did not personally review the discovery and instead told defense counsel to alert him if something was missing. Defense counsel stated that he did not enquire about the missing records because Mr. Copeland had testified that many of TMR's business records had been destroyed at the time of Mr. Partin's departure, and defense counsel assumed that the State had produced all the documents still in existence. Ms. Copeland's testimony at trial revealed that the documents were still in existence, that they were readily available, and that the cost to produce them would not approach the estimated $1,200. The documents were produced for the defense after the trial court granted a continuance.

Approximately two months after the production of the documents, the Defendants moved to dismiss. At the motion hearing, the State for the first time raised the argument that the documents were not in the State's control and argued on this basis that there was no discovery violation. The trial court rejected the argument, finding that the prosecutor

---

[1] *Johnson*, which was issued after the hearing in this case, concluded that the State had no standing to challenge subpoenas issued to witnesses, including the victim, under the circumstances present in that case. *Johnson*, 538 S.W.3d at 51-56.

had "affirmatively taken control of the discovery process at issue by asserting that the State would procure and produce these documents to the defense" and that he had "inserted his office into the discovery process at issue by filing his motion to quash and then agreeing to provide the requested records." The trial court concluded that the documents were within the State's control. Finding no bad faith, the trial court nevertheless concluded that the failure to produce the documents evinced negligence and lack of due diligence. *See State v. Benson*, 645 S.W.2d 423, 424 (Tenn. Crim. App. 1983) (noting that the "existence of a Tenn. R. Crim. P. 16 request places the burden on the state to act with reasonable diligence"). On appeal, the State continues to assert that there was no discovery violation because it did not have possession, custody, or control of the documents.

Rule 16 requires the State to produce certain materials upon receiving a discovery request from the defense:

> Documents and Objects. Upon a defendant's request, the state shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings, or places, or copies or portions thereof, *if the item is within the state's possession, custody, or control and*:
>
> (i) the item is material to preparing the defense;
>
> (ii) the government intends to use the item in its case-in-chief at trial; or
>
> (iii) the item was obtained from or belongs to the defendant.

Tenn. R. Crim. P. 16(a)(1)(F) (emphasis added). The Rule clearly contemplates that the items subject to discovery must be within the possession, custody, or control of the State.

However, it is not necessary for us to determine if the ledgers were in fact in the possession, custody, or control of the State, because the trial court ordered the State to produce the documents and the State failed to lodge any objection to this order. The prosecution could have sought interlocutory review of the trial court's determination that it must produce the requested documents, asserting that the documents were beyond its possession, custody, and control. *State v. Collins*, 35 S.W.3d 582, 584 (Tenn. Crim. App. 2000) ("Had the State wished to appeal the order of the trial court mandating the disclosure of [the discovery], it should have filed an interlocutory appeal"); *see, e.g., State v. Richard Allen Butler*, No. E2004-00359-CCA-R9-CD, 2005 WL 735080, at *3 (Tenn. Crim. App. Mar. 30, 2005) (addressing the propriety of an order to produce

discovery where the State sought interlocutory review of the trial court's determination that the prosecution must comply with the defendant's discovery request), *abrogated by State v. Pickett*, 211 S.W.3d 696, 703 (Tenn. 2007). Here, the State did not object to the trial court's order requiring it to obtain the payroll records from Ms. Copeland, and on the contrary, the prosecutor agreed that he would seek to locate and produce the requested information. The State never asserted that it should not be required to produce the documents because they were beyond the State's control until after the failure to produce them was discovered by the parties during trial. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

The parties disputed the propriety of the discovery, and the State, having waived any objection, was subject to the court's order that it produce the discovery. The State then inadvertently failed to produce the documents at issue. In *State v. Collins*, the trial court had ordered the State to reveal the identity of a confidential informant, and the court dismissed the indictment when the State refused to comply. 35 S.W.3d at 583. On appeal, this court determined that under Tennessee Rule of Appellate Procedure 3(c), the propriety of the underlying determination that the evidence should be subject to discovery was not before the court. *Id.* at 584. Because the State had not sought interlocutory review of the order to produce the discovery, the State could not challenge the trial court's decision to order the disclosure of the confidential informant's identity. *Id.* Instead, this court addressed only the trial court's decision to dismiss the indictment for failure to comply with a discovery order. *Id.*

We conclude that the State was subject to the trial court's order to produce the payroll documents, and as in *Collins*, we do not reach the issue of whether the trial court correctly determined that the evidence was subject to production by the State. *Id.* Instead, we review the propriety of the trial court's order to dismiss based on the State's failure to comply with discovery as ordered by the trial court. *Id.*; *see State v. Rélicka Dajuan Allen*, No. E2007-01018-CCA-R3-CD, 2009 WL 348555, at *3-4, 7 (Tenn. Crim. App. Feb. 12, 2009) (reviewing the trial court's dismissal of the charges based on the prosecutor's refusal to comply with the discovery orders).

### III. Remedy for Discovery Violation

The trial court, having found a discovery violation, relied on Tennessee Rule of Criminal Procedure 16(d)(2) in imposing the sanction of dismissal. Under Tennessee Rule of Criminal Procedure 16(d)(2):

(2) *Failure to Comply with a Request.* If a party fails to comply with this rule, the court may:

(A) order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms or conditions;

(B) grant a continuance;

(C) prohibit the party from introducing the undisclosed evidence; or

(D) enter such other order as it deems just under the circumstances.

Tenn. R. Crim. P. 16(d)(2).

Generally, a trial court's decision to dismiss an indictment is discretionary. *State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013); *State v. Harris*, 33 S.W.3d 767, 769 (Tenn. 2000). An appellate court "'may not interfere with a ruling made within the discretionary powers of the trial court absent clear abuse.'" *Harris*, 33 S.W.3d at 769 (quoting *State v. Street,* 768 S.W.2d 703, 709 (Tenn. Crim. App. 1988)). More particularly, a trial court has "wide discretion in fashioning a remedy for non-compliance with a discovery order." *State v. Downey*, 259 S.W.3d 723, 737 (Tenn. 2008). In sanctioning a failure to comply with discovery, the court should consider the individual circumstances of the case and fashion a remedy which is effective and appropriate. *Collins*, 35 S.W.3d at 585. An abuse of discretion occurs when the trial court applies an incorrect legal standard or when it reaches a decision which is against logic or reasoning and which causes an injustice to the party complaining. *Merriman*, 410 S.W.3d at 791.

In analyzing the available remedies, the trial court found that the evidence had been produced during trial and that ordering discovery would not constitute a remedy. Because the trial court found that the evidence was exculpatory, it noted that exclusion of the evidence was also not an appropriate sanction. The court likewise found that granting a continuance or a mistrial would not constitute an adequate remedy. The court found that a mistrial or continuance would "strengthen" the State's case and result in disadvantage to the defense. The trial court's reasoning was that the State had had the opportunity to observe "the defense strategy play out, be aware of potential weakness in their case and allow for State witnesses to be better prepared for cross examination." In particular, the trial court noted that the prosecutor had stated during argument that Ms. Copeland could account for the apparent advances and the mysterious credits in the ledgers. In noting that the State's witnesses were now on notice regarding the importance the defense placed on the ledgers, the court found that the Defendants would not be able to properly conduct a cross-examination of the witnesses.

"Although Rule 16 does not explicitly provide as one of the sanctions the dismissal of the indictment after failure to comply with a discovery request or order, the

- 14 -

rule does provide that the court may enter such sanction 'as it deems just under the circumstances.'" *Downey*, 259 S.W.3d at 737 (quoting Tenn. R. Crim. P. 16(d)(2)(D)); *see Collins*, 35 S.W.3d at 585 (concluding that authority to dismiss "is apparent" under the Rule); *Street*, 768 S.W.2d at 710 (noting that the sanction of dismissal is not explicit but present by implication). Dismissal is appropriate in circumstances where the court has "no effective sanction for failure to comply with its order" other than dismissal. *Collins,* 35 S.W.3d at 585. Accordingly, while the trial court is certainly vested with the power to dismiss based on a discovery violation, "that power should be used sparingly and only when necessary to avoid irremediable prejudice to Defendant from discovery violations." *Rélicka Dajuan Allen*, 2009 WL 348555, at *7. "[A]chieving the underlying principles of fair and efficient discovery must be the goal of a trial judge in fashioning a remedy for noncompliance." *State v. Michael D. Street*, No. M2004-00299-CCA-R9-CO, 2005 WL 1692948, at *3 (Tenn. Crim. App. July 20, 2005).

In *State v. Collins*, this court upheld the trial court's dismissal of the charges because there was no other effective sanction available to the court. 35 S.W.3d at 585. The trial court in *Collins* had determined that the defendant was entitled to know the identity of a confidential informant who could allegedly provide exculpatory testimony. *Id.* at 583. Because the State refused to reveal the identity of the informant, this court determined that dismissal was "the only just sanction available to the trial court." *Id.* at 585. The trial court had already ordered the State to disclose the identity, a continuance would not have changed the parties' respective positions, exclusion of the evidence was inappropriate because it was allegedly exculpatory, and holding the prosecutor in contempt would not have put the defendant in possession of the disputed discovery. *Id.* The ongoing and irremediable violation in *Collins* demonstrates the type of circumstance which calls for dismissal.

More frequently, however, this court has determined that less extreme sanctions are adequate to remedy any prejudice suffered from a violation of the rules of discovery. In *State v. Rélicka Dajuan Allen*, the prosecutor had been ordered numerous times by the trial court and by this court to comply with a discovery order but had evinced an "obstinate refusal to comply." 2009 WL 348555, at *7. The prosecutor eventually expressed a "grudging[]" willingness to abide by the order, but the trial court dismissed the indictment. *Id.* at *8. This court reversed the dismissal, noting that if the prosecutor was willing to abide by the order, dismissal was improper because the defense would not suffer irremediable prejudice. *Id.* at *7; *but see id.* at *9 (McLin, J., dissenting) (concluding that the prosecutor's blatant refusal to abide by the order justified suppression of the evidence and dismissal despite "the state's eleventh-hour willingness to provide the discovery to the defendant only under threat of potential federal prosecution [of defense counsel]").

Dismissal with prejudice represents an extreme sanction rarely employed to remedy delayed discovery. *See Downey*, 259 S.W.3d at 737 (concluding that when the State had failed to produce part of a video recording, the trial court's remedy of excluding the evidence rather than dismissing the charges was proper); *State v. Jessica Kennedy*, No. E2013-00260-CCA-R3-CD, 2014 WL 3764178, at *71 (Tenn. Crim. App. July 30, 2014) (upholding the trial court's denial of a motion to disqualify the prosecutor as a sanction for discovery violation and upholding the denial of a motion to dismiss because the defendant could not show prejudice from late discovery); *Street*, 768 S.W.2d at 710 (concluding that the trial court correctly determined that a delay in discovery "did not warrant a dismissal" when the defendant did not articulate prejudice); *see also State v. Eric Williams*, No. W2013-01593-CCA-R3-CD, 2015 WL 1453389, at *16 (Tenn. Crim. App. Mar. 27, 2015) (concluding that the defendant was not entitled to relief for a Rule 16 violation when the State failed to disclose expert testimony but the defendant did not request a continuance or introduce contrary expert testimony at the motion for a new trial); *State v. Devonta Amar Cunningham*, No. M2012-02203-CCA-R3-CD, 2015 WL 173495, at *16 (Tenn. Crim. App. Jan. 14, 2015) (upholding trial court's refusal to impose sanctions under Rule 16 when cell phone records were not disclosed but the defendant did not request a continuance and was aware of the evidence before trial); *State v. Johnathan Johnson*, No. M2013-00301-CCA-R3-CD, 2014 WL 2016712, at *10 (Tenn. Crim. App. May 15, 2014) (finding no abuse of discretion when the trial court granted a continuance for late discovery rather than excluding evidence).

One determinative factor in fashioning relief is prejudice accruing to the accused. *State v. Giles*, 493 S.W.3d 504, 521 (Tenn. Crim. App. 2016). When the prosecution has failed to disclose discoverable evidence, the burden of proving "the degree to which the impediments to discovery hindered trial preparation and defense at trial" falls on the defendant. *State v. Brown*, 836 S.W.2d 530, 548 (Tenn. 1992). The trial court should consider what prejudice, if any, the defendant may suffer when determining whether to grant a continuance, suppress evidence, dismiss the charges, or grant some other relief. *State v. Garland*, 617 S.W.2d 176, 185-86 (Tenn. Crim. App. 1981) (concluding that there was no evidence of prejudice to the defendant from the late production of a photograph which the defendant was not able to inspect prior to its admission and upholding the trial court's refusal to exclude the photograph); *see State v. Michael Dewayne Hall*, No. E2015-02173-CCA-R3-CD, 2017 WL 1828357, at *5 (Tenn. Crim. App. May 4, 2017) (upholding the trial court's denial of sanctions when the State failed to disclose a map used at trial which showed that the drug transaction was within one thousand feet of two parks, rather than one park as indicated on a map produced in discovery, because there was no showing of prejudice); *State v. Douglas Kincaid*, No. W2015-00689-CCA-R3-CD, 2016 WL 353237, at *7-8 (Tenn. Crim. App. Jan. 28, 2016) (concluding there was no prejudice from delay in discovery of cell phone records and the defendant's oral statement); *State v. Michael Wayne Davis*, No. M2010-02108-CCA-R3-

- 16 -

CD, 2013 WL 105172, at *10 (Tenn. Crim. App. Jan. 9, 2013) (affirming the trial court's denial of sanctions for a discovery violation when the defendant was not able to articulate what prejudice he suffered or how his trial strategy would have changed if the disclosure of his prior statement had been timely); *State v. Hershel Wayne Grimes*, No. M2006-01531-CCA-R3-CD, 2007 WL 1670188, at *24 (Tenn. Crim. App. June 8, 2007) ("The Defendant has not provided how he would have prepared differently for trial had he known of this statement.").

A court should consider whether any prejudice can be removed by lesser means when imposing a sanction. *State v. Briley*, 619 S.W.2d 149, 152 (Tenn. Crim. App. 1981) ("The evidence should be excluded only when the failure to comply with a Rule 16 order results in actual prejudice to a party, and the prejudice cannot be removed by a continuance or means other than suppression."); *State v. Payne*, 791 S.W.2d 10, 16 (Tenn. 1990) ("Evidence should not be excluded for non-compliance except when it is shown that Defendant is actually prejudiced by the State's failure and the prejudice cannot otherwise be eradicated.").

This court has enumerated the following factors to be considered in determining prejudice:

> the proximity to trial; the degree to which an aggrieved party was otherwise aware of the undisclosed evidence or should have reasonably been aware in time to have investigated and prepared for the undisclosed evidence's introduction; the importance of the evidence and of its disclosure; the degree to which the evidence is merely cumulative of other evidence bearing on the same or a similar point; the availability and likely effectiveness of less drastic sanctions; the failure of an aggrieved party to seek an alternate remedy; the length of delay in complying with the required disclosures; and whether the failure to comply with discovery rules was willful or inadvertent so as to gain a prejudicial or tactical advantage.

*Michael D. Street*, 2005 WL 1692948, at *4; *see also State v. Danny Jerome Jones*, No. 01-C-01-9307-CR00233, 1994 WL 369728, at *4 (Tenn. Crim. App. July 14, 1994) (noting that the trial court should consider the reason for the failure to comply, the time between production of the evidence and trial, the prejudice resulting from untimely disclosure, and any additional circumstances).

Here, the prosecution failed to produce the documents, and the parties discovered that Ms. Copeland had them in her possession during the bench trial. They were produced shortly after they were discovered, and the Defendants were granted a two-month continuance to review the discovery. The discovery materials were not included

- 17 -

in the appellate record, but the record does contain the trial court's factual findings regarding the late-produced discovery, and we conclude that the absence of the ledgers does not hamper our review. *See* Tenn. R. App. P. 24(b) (the appellant has the duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal"); *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012) ("If, however, the record is adequate for a meaningful review, the appellate court may review the merits of the sentencing decision with a presumption that the missing transcript would support the ruling of the trial court."). The trial court made a factual finding that the ledgers were favorable to the Defendants and that they supported the theory that employees regularly made purchases with company funds and then reimbursed TMR; in the absence of the ledgers, we presume that this finding is correct. *See State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993) (noting that in the absence of a complete record, the appellate court presumes that the trial court's judgments were correct). The trial court further found that the evidence was important impeachment material because witnesses had testified that employees were not permitted to make personal purchases, and the court found that the evidence also revealed the existence of new witnesses.

Evaluating the factors in *Street*, the disclosure did not take place until trial. The defense was aware that payroll records might be available from Ms. Copeland's computer but did not know that the records would include documents supporting the theory of the defense. The trial court found that the materials were exculpatory and material, and they were not cumulative of other evidence. The failure to produce was inadvertent.

In evaluating less drastic sanctions, the trial court concluded that a mistrial or continuance would be inappropriate because the State would have gained an advantage from observing the defense during the trial and because the State's witnesses would be better prepared for cross-examination about the documents. The Defendants argued that they would lose the element of surprise in a retrial and that the witnesses would be able to prepare responses. The trial court also found that several witnesses had already testified and that the new discovery was relevant to impeaching the testimony of these witnesses. However, other than citing to the loss of the element of surprise in cross-examination and raising the specter of false testimony, the Defendants have not articulated any concrete prejudice from the late discovery or explained how they would be in a worse position on retrial than they would have been had the ledgers properly been produced.

We conclude that the prejudice stemming from a loss of the element of surprise on cross-examination during a retrial is not sufficient to warrant dismissal of the charges. *See State v. Gaddis*, 530 S.W.2d 64, 69 (Tenn.1975) (noting that the adversarial system is not "'a poker game in which players enjoy an absolute right always to conceal their cards until played'" (quoting *Williams v. Florida*, 399 U.S. 78, 82 (1970)); *State v. Clifford*

*Dalton*, No. C.C.A. 281, 1989 WL 40890, at *3 (Tenn. Crim. App. Apr. 27, 1989) ("We held the view, at least up to now, that the practice of law in Tennessee had emerged from the dark and gloomy days of 'I've Got a Secret' into the bright, shining era of 'Show and Tell.'"). Neither is the mere possibility that a witness, armed with the knowledge of the other party's proof, might testify dishonestly. Here, the theory of the defense was laid out in the initial contested subpoena. While the trial court noted that the defense would be hampered in its cross-examination because the witnesses had been alerted to the defense's interpretation of the ledgers and might prepare testimony, this is the sort of prejudice that the trial court, as the trier of fact in a bench trial, could have remedied with its credibility determinations. By its very nature, every retrial involves revisiting a proceeding where the parties have already observed one another's evidence and trial strategy.

Dismissal is appropriate "only when necessary to avoid irremediable prejudice to Defendant from discovery violations." *Rélicka Dajuan Allen*, 2009 WL 348555, at *7. We do not think that the Defendants here have demonstrated that they would suffer irremediable prejudice for which there is no effective sanction other than dismissal. *See id.* (reversing dismissal because prejudice was not irremediable). The discovery of the documents occurred during a bench trial which had already been continued over a period of months and in which witnesses could have been recalled. The credibility of the State's witnesses was a matter for the trial court's sole determination. Furthermore, the trial court granted a mistrial to allow the defense to use the new discovery on cross-examination. Accordingly, the trial court's conclusion that it had no effective sanction other than dismissal was contrary to reason and constituted an abuse of discretion. *See Collins,* 35 S.W.3d at 585.

## CONCLUSION

Based on the foregoing, we reverse the trial court's dismissal of the indictment and remand for further proceedings.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE